**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 11, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHIMERA INVESTMENT COMPANY,

     Plaintiff - Appellant,

v.

STATE FARM FIRE & CASUALTY
COMPANY,

     Defendant - Appellee.

No. 06-4268
D.C. No. 2:05-CV-114-TC
District of Utah

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO, HOLLOWAY** and **TYMKOVICH**, Circuit Judges.

---

This appeal arises from a liability insurance coverage dispute. Plaintiff-Appellant

Chimera Investment Company brought this action to recover under a business liability

insurance policy issued by Defendant-Appellee State Farm Fire & Casualty Company.

Jurisdiction in the district court was based on diversity of citizenship and amount in

controversy.

Both parties moved for summary judgment. The district court granted summary

judgment to State Farm, holding that the delay in notifying State Farm of the claim had

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P.32.1 and 10th Cir. R. 32.1.

caused it prejudice and so had nullified its duties under the policy. Alternatively the district court held that the underlying claims were not within the coverage of the insurance policy.

Chimera appeals. Jurisdiction in this court is based on 28 U.S.C. § 1291.

## I. Background

*A. Underlying facts.*

At the bottom of the entire controversy is a condominium unit in Park City, Utah, unit 2 of seven in the Coalition Lodge Condominiums. The condominiums had an owners' association called Coalition Lodge Condominium Association of United Owners ("the Association" or the Insured). The Association had a liability insurance policy issued by State Farm.

Marguerite Johnson was the former owner of unit 2. She also owned Coalition Condos, a management company that rented out the units at Coalition Lodge. Marguerite's son, Max Johnson, and their attorney, Ruth Wagner, acted as members of the management committee.

Beneficial Mortgage Company had made a loan to Marguerite Johnson secured by a deed of trust on unit 2. She defaulted and Beneficial foreclosed. Fidelity Funding Company (Fidelity) purchased unit 2 at a foreclosure sale in February 2000. When Fidelity tried to take possession, it found the unit occupied, and the locksmith Fidelity had sent was told that he could not change the locks. About a month later, on March 27, 2000, Fidelity found the unit unoccupied and changed the locks. Fidelity had possession

of unit 2 for about the next nine weeks, during which time Max Johnson repeatedly demanded that he be given a key to the unit. On June 3, 2000, Fidelity found that the door to the unit had been broken open, damaging the door frame, and that Max Johnson or someone associated with him had a key.

Fidelity wrote to Ruth Wagner protesting the fact that the Johnsons had a key to unit 2 and warning of trespass charges. The letter also said that Fidelity would manage the unit for itself unless and until its problems with the Johnsons were resolved. Shortly after that there was a discussion between the parties during which Max Johnson and Ruth Wagner claimed that the Association's bylaws authorized them to manage all of the condominium units, including unit 2. Fidelity and its lawyer asserted that Utah law invalidated any provision of the condominium association's agreement or bylaws that would purport to divest them of the right to exclusive ownership and possession of their property.[1]

### B. *The state court lawsuit against the insured.*

About three months after the discussion just described, Fidelity filed suit. Fidelity sued the Johnsons, Wagner, Coalition Lodge Condominiums, Coalition Condos (the management company owned by Marguerite Johnson), and the Association. The lawsuit alleged eleven claims, including unlawful detainer, trespass, private nuisance, conversion (of rents received), quiet title, breach of fiduciary duty, and slander of title. The present

---

[1]The reference was presumably to Utah Code Ann. § 57-8-6, part of the Utah Condominium Ownership Act, which provides: "Each unit owner shall be entitled to the exclusive ownership and possession of his unit."

suit concerns whether that suit by Fidelity was within the liability insurance coverage of the policy issued to the Association by State Farm.

Ruth Wagner filed an answer on behalf of most of the defendants but did not continue to actively defend the case. Eventually, due to the failure of the defendants (including at least the Johnsons, Wagner, and the Association) to comply with discovery orders and to respond to Fidelity's motion for summary judgment, Fidelity obtained a judgment by default.

*C. Demand under the policy.*

It was only after judgment that Fidelity learned of the Association's liability policy with State Farm. Demand was made on the policy. State Farm retained counsel who entered an appearance in the case. State Farm provided counsel under a reservation of rights and with the stated purpose of analyzing the claim to see if there was potential coverage under the policy.

State Farm quickly decided to deny coverage and instructed the lawyers to withdraw from the representation. The letter to the insured said that coverage was denied because of both the late notice and the independent determination that the claims against the insured were not covered.

Chimera makes its claim under the policy in the instant action as assignee of the insured and of the judgment creditor of the insured. Chimera's right to pursue the claim as assignee is not disputed in these proceedings.

## II. The District Court's Opinion

The district court only analyzed the issue of whether the delay in giving notice to State Farm should relieve it of any duties it would otherwise have had to its insured on the Fidelity claim and lawsuit. It is undisputed that the insured Association did not provide timely notice as required under the policy. State Farm did not receive notice until almost a year after the lawsuit had been filed and, as noted, after judgment by default had been entered against the insured and the other state court defendants.

Citing *FDIC v. Oldenburg*, 34 F.3d 1529, 1545-46 (10th Cir. 1994), the district judge said that noncompliance with the notice provision may defeat coverage if there is a showing of substantial prejudice to the insurer. The district judge concluded that in this case "unquestionably" there was substantial prejudice to State Farm. The judge concluded that *Johnston v. Sweany*, 68 S.W.3d 398 (Mo. 2002), was persuasive. In that case, as in the instant case, the insurer had not been given notice until judgment by default had been given against the insured. The Missouri court said that the insurer had been presented with a "fait accompli." Similarly, the district judge said, in this case the insured's delay deprived State Farm of the opportunity to bring a declaratory judgment action to determine coverage before final judgment, and also deprived State Farm of the opportunity to dispute the amount of damages or to investigate the claim before entry of judgment. Therefore, she said, prejudice was "clear on its face." In a footnote, she said that because of the insured's dilatory conduct in the underlying state court action brought by Fidelity, it would be "difficult, if not impossible" to convince the state court to set

-5-

aside the default judgment.

As an alternative ground for granting State Farm's motion for summary judgment, the district judge said that even if notice had been given, the allegations of Fidelity's state court suit did not give rise to a covered claim "for the reasons set for in State Farm's briefs." No discussion or analysis followed this conclusion.

### III. Analysis

*A. Standard of Review and Governing Law.*

We review the district court's grant of summary judgment *de novo*. The parties agree that this case is controlled by Utah law. The primary issues involve interpretation of the liability insurance policy. "Courts interpret words in insurance policies according to their usually accepted meanings and in light of the insurance policy as a whole. Policy terms are harmonized with the policy as a whole, and all provisions should be given effect if possible." *Utah Farm Bureau Ins. Co. v. Crook*, 980 P.2d 685, 686 (Utah 1999) (internal citation omitted). We decide this appeal on the alternative ground for the district court's ruling, concluding that the policy does not provide coverage for the claims at issue.[2]

*B. The coverage for personal injury.*

[2]Notwithstanding the surface appeal of the rationale employed by the district court – that a liability insurer which is not notified of an action against its insured until after a default judgment has been entered has necessarily been prejudiced by the untimely notice – we find significant obstacles to affirming the judgment on this basis. Counter arguments have been raised by Chimera, and the correct resolution under Utah law of the issues raised in these arguments is less than clear. Consequently we find it prudent to decide the coverage issues.

The definition of "personal injury" in the policy includes injury "arising out of one or more of the following offenses: . . . wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor . . . ."

Chimera argues that Fidelity's state court complaint against the Insured clearly alleged unlawful entry, trespass, and wrongful eviction from unit 2 and that the undisputed facts show that the Insured Association was liable to Fidelity on those claims.[3] Fidelity was entitled to possess its own property. Persons acting on behalf of the Insured ousted Fidelity from possession (a wrongful eviction); leased unit 2 to tenants of their choosing who occupied it over Fidelity's objection (a wrongful entry); and did so in derogation of Fidelity's right to exclusive use of unit 2 (an invasion of Fidelity's right of private occupancy). These were "personal injuries" within the policy's definitions, Chimera contends.

We disagree. The coverage extends to wrongful entry or eviction (and so forth) "by or on behalf of the owner." Here, Fidelity was the owner. The wrongful entry was not "on behalf of" Fidelity but was actually in defiance of Fidelity's rights. Giving the terms of the policy "their usually accepted meanings," *see Utah Farm Bureau*, 980 P.2d at 686, we conclude that the policy did not cover these "offenses."

---

[3]The parties disagree as to whether the coverage analysis should be based only on the allegations of the pleadings in the case against the insured or whether the court may consider other evidence. We need not and do not decide the point. None of the extrinsic evidence cited by Chimera is sufficient, we conclude, to establish coverage, assuming *arguendo* that such evidence is properly to be considered.

Another part of the definition of personal injury on which Plaintiff Chimera relies describes another "offense" that may give rise to a covered injury: "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." Chimera's argument for coverage under this policy provision is strained and unpersuasive. Chimera asserts that the Association, acting through the management company, advertised unit 2 for lease. The Association, however, had the duty to enforce all provisions of its agreement and bylaws, as well as the duty to enforce Utah's statute providing that each unit owner must have the exclusive ownership and use of his unit. By offering unit 2 for lease through the management company, the advertisements disparaged the Association's services by showing that it was not living up to its required duty to enforce Fidelity's right to lease unit 2, Chimera asserts.

We conclude that no reasonable person would have understood this policy provision to provide coverage to an insured for slandering the insured's own services. This is a liability policy. Even if we were to accept, for argument's sake, the notion that one can disparage one's own services, we do not see where liability insurance would come into play in such a scenario. Liability is by definition, an obligation owed to a third party, not to one's self. Chimera apparently argues, however, that this was not a case of self-slander, that it was the management company which slandered the Association's "services" to Fidelity. (Reply brief at 17.) Because the management company was purporting to act on behalf of the Association, we do not see that this makes a difference.

Most importantly, however, even if we were to assume that the two entities had no relationship, two factors would still defeat Chimera's argument. First, the Association was the insured under the policy. To the extent that the management company acted independently, the insured Association would not be subject to liability in any event. And, all else aside, the injuries for which Fidelity sought to recover in its state court lawsuit were manifestly not the purported injuries to the Association resulting from the disparagement of *its* services.

    *C. The coverage for advertising injury.*

Chimera's argument for coverage under the separate policy provision covering "advertising injury" is akin to the argument we have just rejected concerning the personal injury of slander or libel of the Association's services. The policy provided this pertinent definition: "[A]dvertising injury means injury arising out of one or more of the following offenses: a. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's . . . services . . . ." (Brief of the Appellant at 5.)

As in the previous argument, Chimera contends that the advertising for lease of unit 2 by the management company constituted a slander or libel of the Association's services (because one of the legal duties of the Association was to support Fidelity's right to exclusive possession of unit 2). The injuries suffered by Fidelity (loss of right of occupancy, loss of right to choose to whom the unit would be leased, loss of rental income, etc.) arose from this disparagement of the Association's services, Chimera

argues, because the phrase "arising out of" imparts a broad meaning under Utah law, requiring only some causal connection between the injury and the risk for which coverage is provided.[4]

We conclude that this purported connection between the "offense" of the slandering of the Association's services and the injuries sustained by Fidelity is far too indirect to come within the coverage of the policy. Construing the policy as a whole and giving the terms their ordinary meaning, we conclude that the liability against which State Farm insured was liability to the person or organization whose services were slandered, and not to Fidelity, which had no direct connection to this alleged "advertising injury."

*D. Evidentiary issue.*

Chimera also contends that the district court abused its discretion by considering evidence that State Farm allegedly had "withheld" during discovery. We believe that the issue would be more accurately framed as whether the district court abused its discretion by allowing State Farm to supplement its discovery disclosures and responses after Chimera had filed a motion in limine to restrict State Farm to the witnesses and documents it had disclosed in a timely manner. The district court also allowed State Farm to supplement its filings in support of its motion for summary judgment after finding that certain evidence submitted by State Farm had not been properly authenticated.

We see no abuse of discretion. In the first place, Chimera's briefs leave us

---

[4]Chimera cites *National Farmers Union v. Western Cas. & Surety Co.*, 577 P.2d 961, 963 (Utah 1978), for this proposition.

uncertain as to just what evidence it contends should have been excluded. To the extent we can discern the subject of Chimera's dispute, we see nothing to even suggest that there was an abuse of discretion. For example, Chimera complains that tardy disclosure deprived it of a meaningful opportunity to conduct follow-up discovery, but we are not told what testimony or documents merited follow-up discovery in Chimera's view, much less what Chimera might have been able to establish with more discovery.

In fact, the record is replete with statements that rebut the contention that Chimera has been unfairly prejudiced. Every witness that was disclosed after State Farm's original disclosures and discovery responses was a person whose identity was already known to Chimera, it appears.[5] And counsel for Chimera expressly stated that he intended to await a ruling on the cross-motions for summary judgment before deposing these persons.[6] At the hearing on the cross-motions for summary judgment, counsel for Chimera stated: "I don't think that there are any genuine disputes raised as to any of the material facts raised by either side. And so I would think that . . . this case should be resolved as a result of these motions one way or the other." II App. 614.

As best we can determine, Chimera's complaints were primarily focused on State Farm's efforts to establish the date that it received notice. Thus, at the hearing on the motions for summary judgment, soon after making the statement quoted above about the

---

[5]For example, see Supp. App. of Aple. at 16 (transcript of hearing on Chimera's motion in limine), where counsel for Chimera acknowledges that the witnesses had been named by Chimera in its Rule 26(a)(1) disclosures.

[6]Supp. App. of Aple. at 20.

absence of any issues of fact, counsel for Chimera made it clear that his position was that State Farm should not be allowed to establish this basic fact because of procedural missteps, such as submitting a document in support of its summary judgment motion which had not been properly authenticated. But as far as the record and appellate arguments reveal, Chimera has never contended that there is a genuine issue of material fact about the date.

Our resolution of this appeal on the issue of the coverage of the policy, rather than the untimely notice to State Farm, would appear to moot this issue. In any event, we conclude that the district court was well within its discretion in permitting State Farm to file additional affidavits to authenticate the documents on which it relied. Indeed, the court's exercise of discretion in State Farm's favor appears to be entirely consistent with the over-arching directive of Fed. R. Civ. P. 1: "These rules . . . shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."

## Conclusion

The judgment of the district court is AFFIRMED.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge

-12-