IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Fire Insurance Exchange, a reciprocal or inter-insurance exchange, | ) ) ) | OPINION |
| | ) | Case No. 20100462-CA |
| Plaintiff and Appellee, | ) | |
| | ) | |
| v. | ) | F I L E D |
| | ) | (August 16, 2012) |
| Robert Allen Oltmanns and Brady Blackner, | ) ) | |
| | ) | 2012 UT App 230 |
| | ) | |
| Defendants and Appellants. | ) | |

-----

Second District, Farmington Department, 090700825
The Honorable Glen R. Dawson

Attorneys:      Alan W. Mortensen, Paul M. Simmons, and Donald L. Dalton, Salt Lake
                City, for Appellants
                Aaron Alma Nelson, Salt Lake City, for Appellee

-----

Before Judges McHugh, Voros, and Orme.

ORME, Judge:

¶1      Robert Oltmanns and Brady Blackner appeal the decision of the district court
granting Fire Insurance Exchange's motion for summary judgment. The court
determined that the term "jet ski" as used in a homeowner's policy was unambiguous
and effectively excluded coverage for claims arising from the use of any and all
personal watercraft. We reverse.

BACKGROUND

¶2    Oltmanns, the insured, and his friend Blackner were operating a Honda F-12 AquaTrax personal watercraft on a lake in southern Utah.  This kind of personal watercraft is designed for use by a seated driver and up to two additional seated passengers.  A lawsuit resulted from injuries sustained in an accident that occurred during this use, and Oltmanns tendered the defense to Fire Insurance Exchange, with whom he was insured under a homeowner's policy.  The insurance policy contained the following exclusion from its liability coverage:

> We do not cover bodily injury [that] . . .
> . . .
> 7.  results from the ownership, maintenance, use, loading or unloading of:
>> a. aircraft
>> b. motor vehicles
>> c. jet skis and jet sleds or
>> d. any other watercraft owned or rented to an insured and which:
>>> (1)  has more than 50 horsepower inboard or inboard-outdrive motor power; or
>>> (2)  is powered by one or more outboard motors with more than 25 total horsepower; or
>>> (3)  is a sailing vessel 26 feet or more in length.
> Exclusions 7c and d do not apply while jet skis, jet sleds or watercraft are stored . . . .

¶3    Relying on this exclusion, the insurance company brought a declaratory judgment action against Oltmanns and Blackner, arguing that it had no duty to defend or indemnify Oltmanns or compensate Blackner because liability coverage was excluded by the above provision.  The insurance company then moved for summary judgment, arguing that Oltmanns was operating a "jet ski," which is merely a synonym for personal watercraft, and that the policy unambiguously excluded coverage for use of all such watercraft.  Oltmanns argued that the exclusion did not apply because it was ambiguous, pointing out that "Jet Ski" is a registered trademark for a particular model of Kawasaki personal watercraft, which was not involved in the accident.  The trial

court granted the insurance company's motion for summary judgment, and this appeal followed.

ISSUE AND STANDARD OF REVIEW

¶4     Oltmanns and Blackner contend that the trial court erred in granting the insurance company's motion for summary judgment. A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "Where the moving party would bear the burden of proof at trial, the movant must establish each element of his claim in order to show that he is entitled to judgment as a matter of law." *Orvis v. Johnson*, 2008 UT 2, ¶ 10, 177 P.3d 600. Even "'[w]here the party opposed to the motion submits no documents in opposition, the moving party may be granted summary judgment *only . . . if he is entitled to judgment as a matter of law.*'" *Ward v. Graydon*, 2011 UT App 358, ¶ 15, 264 P.3d 764 (emphasis and omissions in original) (quoting *Olwell v. Clark*, 658 P.2d 585, 586 (Utah 1982)), *cert. denied*, 275 P.3d 1019 (Utah 2012). A trial court's ruling on summary judgment presents a question of law. *See Massey v. Griffiths*, 2007 UT 10, ¶ 8, 152 P.3d 312. The court's "legal conclusions and ultimate grant or denial of summary judgment are reviewed for correctness." *Id.* Also, "[i]nterpretation of an insurance contract presents a question of law" and we "accord the trial court's legal conclusions regarding the contract no deference but review them for correctness." *Bear River Mut. Ins. Co. v. Williams*, 2006 UT App 500, ¶ 7, 153 P.3d 798 (citations and internal quotation marks omitted).

ANALYSIS

¶5     The insurance company argues that its use of the term "jet ski" was intended to refer to any and all personal watercraft. It contends that "jet ski" is common vernacular for such and thus is not ambiguous. Before we attempt to understand what "jet ski" means for purposes of this contract, however, it is helpful to review the rules governing contract interpretation, particularly in the insurance contract context.

¶6     "Insurance policies are generally interpreted according to rules of contract interpretation." *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685. Because "an insurance policy is a classic example of an adhesion contract," Utah courts have long held that "'insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of

insurance.'" *United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d 519, 521-22 (Utah 1993) (quoting *Richards v. Standard Acc. Ins. Co.*, 58 Utah 622, 200 P. 1017, 1020 (1921)). "It follows that ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage" and "provisions that limit or exclude coverage should be strictly construed against the insurer." *Id.* at 522-23. In strictly construing exclusions, we give them effect only when they use "language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Crook*, 1999 UT 47, ¶ 5 (citations and internal quotation marks omitted).

¶7 When faced with ambiguity in a written contract, courts do not interpret the provision to comport with what they think is most sensible or is most likely what one of the parties "really" meant or is what leads to the fairest result. Rather, they recognize the need to consider extrinsic evidence in an effort to resolve the ambiguity. *See Wilburn v. Interstate Electric*, 748 P.2d 582, 584-85 (Utah Ct. App. 1988). If the extrinsic evidence is not conclusive, then the last resort in contract interpretation is to construe the provision *against* the drafter. *See id.* at 585 ("Once a contract is deemed ambiguous, the next order of business is to admit extrinsic evidence to aid in interpretation of the contract. It is only after extrinsic evidence is considered and the court is still uncertain as to the intention of the parties that ambiguities should be construed against the drafter.") (footnote omitted).

¶8 As a practical matter, though, there is a different protocol in the case of insurance and surety contracts, where it is seen as appropriate to jump immediately to what is usually viewed as the "last resort," "tie-breaker" rule of interpretation, namely construction against the drafter. *See id.* at 585 & n.2. This is due to the probable dearth of relevant extrinsic evidence in these contexts. *See id.* (noting that while the usual rule is that extrinsic evidence must be considered before turning to the rule of construction that calls for ambiguities to be construed against the drafter, there are "arguable exceptions" in the case of insurance and surety contracts that "may be explained, at least in part, by the fact that such contracts are ordinarily not preceded by discussion or negotiation of specific terms and, thus, absent meaningful extrinsic evidence as to intent, recourse must be had directly to the maxim that ambiguities should be construed against the drafter"). As noted above, construction against the insurer is especially appropriate when an ambiguous term appears in an exclusionary provision because such provisions are "strictly construed against the insurer." *Sandt*, 854 P.2d at 523.

¶9 In the case at hand, it may be true that the insurer meant, through its use of the term "jet ski," to exclude from coverage all varieties of personal watercraft. And we are

confident that the insurer did not intend to refer only to a particular Kawasaki model of personal watercraft, even though there is such a model named Jet Ski.  But the provision in question is not a model of clarity and at least one additional interpretation is entirely possible.  Another common use of the term "jet ski" is in reference to the stand-up variant of personal watercraft, in contradistinction to the sit-down variety, known colloquially—and also imprecisely—as wave runners.  The subject is well-illuminated in that great repository of contemporary wisdom, Wikipedia:[1]

> Jet Ski is the brand name of a personal watercraft manufactured by Kawasaki Heavy Industries.  The name is sometimes mistakenly used by those unfamiliar with the personal watercraft industry to refer to any type of personal watercraft; however, the name is a valid trademark registered with the United States Patent and Trademark Office, and in many other countries.  The term "Jet Ski" (or JetSki, often shortened to "*Ski*") is often mis-applied to all

---

1.  In the past, we might have hesitated to cite Wikipedia in a judicial opinion given its reputation—perhaps not well deserved—for unreliability.  *See, e.g.*, *Wikipedia Survives Research Test*, BBC News (Dec. 15, 2005), http://news.bbc.co.uk/2/hi/technology/4530930.stm (finding rate of error in scientific articles to be about the same as between Wikipedia and Encyclopedia Britannica).  But the increasing trend of using Wikipedia in judicial opinions over the last decade seems to demonstrate a growing recognition of its value in some contexts, as noted in one 2010 article that found that by that year Wikipedia had been cited in over four hundred judicial opinions.  *See* Lee F. Peoples, *The Citation of Wikipedia in Judicial Opinions*, 12 Yale J. L. & Tech. 1, 1 (2009–2010) (reviewing several instances in which Wikipedia has been cited in judicial opinions and critiquing its usefulness, or lack thereof, in those contexts). Judge Posner argued in 2007 that "Wikipedia is a terrific resource . . . [p]artly because it [is] so convenient, it often has been updated recently and [it] is very accurate," after citing it in *United States v. Radomski*, 473 F.3d 728, 731 (7th Cir. 2007).  *See* Noam Cohen, *Courts Turn to Wikipedia, but Selectively*, N.Y. Times, Jan. 29, 2007 at C3. While a prudent person would avoid a surgeon who bases his or her understanding of complicated medical procedures on an online source whose contributors range from expert scholars to internet trolls, where an understanding of the vernacular or colloquial is key to the resolution of a case, Judge Posner is correct that Wikipedia is tough to beat. A fuller explanation of the propriety of citing Wikipedia is set forth in Judge Voros's separate opinion.

> personal watercraft with pivoting handlepoles manipulated
> by a standing rider; these are properly known as Stand-up
> PWCs. The term is often mistakenly used when referring to
> WaveRunners, but WaveRunner is actually the name of the
> Yamaha line of sit-down PWCs, whereas "Jet Ski" refers to
> the Kawasaki line.

Jet Ski, http://en.wikipedia.org/wiki/Jet_ski (last visited August 13, 2012) (footnotes omitted).

¶10    Basically, then, the insurer was imprecise in using the term "jet ski" in its policy. Even discounting the bizarre possibility that it meant to refer only to one Kawasaki watercraft model, it still cannot be definitively said what the insurer intended: Did it mean all manner of personal watercraft? Or did it mean only the stand-up variety?[2] The provision, then, is ambiguous as a matter of law.[3]

---

2. This does not seem like a terribly far-fetched proposition. Intuitively, at least, it seems that a motorized watercraft on which the rider stands up may be much more dangerous than one on which the rider is seated.

3. The insurer's lack of care in drafting this provision is further demonstrated by its pairing of the term "jet sled" with "jet ski." The author of this opinion theorized at oral argument that perhaps "jet sled" was used in reference to the sit-down variants of personal watercraft while "jet ski" was used to refer to the stand-up kind. The idea had no takers, however, despite its apparent logic, and indeed, our research finds not a single instance where "jet sled" has been used synonymously with personal watercraft of any sort. Wikipedia does not even have an article, among its several million, on jet sleds. It appears that "jet sled" can refer to an unmotorized sled used for hauling ice fishing equipment, *see* Shappell, Multi-Purpose Sleds, http://www.shappell.com/sleds.html (last visited August 8, 2012), or to a large motorboat of the sort that would be readily and redundantly covered in the next subsection, subsection (d), of the exclusion in question, *see* Google Images for "Jet Sled Boat," http://google.com (follow "Images" option; then search "Jet Sled Boat") (last searched August 8, 2012).

20100462-CA                               6

CONCLUSION

¶11    This provision fails to "clearly and unmistakably communicate[] to the insured the specific circumstances under which the expected coverage will not be provided." *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685 (citation and internal quotation marks omitted). Because the exclusionary provision is ambiguous, it must be construed against the drafter, and thus the language relied on by the insurance company is not effective to exclude coverage for an insured's accident resulting from use of an AquaTrax personal watercraft of the sit-down variety. The summary judgment is reversed and the case remanded for trial or such other proceedings as may now be in order.

_____
Gregory K. Orme, Judge

-----

¶12    I CONCUR:

_____
Carolyn B. McHugh,
Presiding Judge

-----

VOROS, Associate Presiding Judge (concurring):

¶13    I concur fully in the lead opinion. I write separately to explain why I believe that opinion appropriately cites Wikipedia in construing the term "jet ski" in the insurance contract at issue here. Wikipedia has been cited in hundreds of American judicial opinions, including one issued by the Utah Supreme Court. *See State v. Alverez*, 2006 UT 61, ¶ 16 n.5, 147 P.3d 425 (citing a Wikipedia entry on Jesus Malverde). But today's lead opinion is the first time this court has cited it.

20100462-CA                                    7

¶14     Wikipedia is a "free, collaboratively edited, and multilingual Internet encyclopedia" whose 22 million articles (over 4 million in English) are written by volunteers. Wikipedia, *Wikipedia*, http://en.wikipedia.org/wiki/Wikipedia (as of Aug. 13, 2012, 18:48 GMT). Most of its articles can be edited by anyone with access to the site. Wikipedia claims to be "the largest and most popular general reference work on the Internet," with "an estimated 365 million readers worldwide" and "2.7 billion monthly pageviews from the United States alone." *Id.* (footnotes omitted).

¶15     Because Wikipedia is an open-source project, questions arise as to its reliability. Indeed, Wikipedia's own article on the subject references various studies as well as opposing views from librarians, academics, experts in science and medicine, and editors of other encyclopedias. *See* Wikipedia, *Reliability of Wikipedia*, http://en.wikipedia.org/ wiki/Reliability_of_Wikipedia (as of Aug. 13, 2012, 18:51 GMT). In addition, most or all Wikipedia entries include a broad disclaimer on the entry's citation page:

> **IMPORTANT NOTE:** Most educators and professionals do not consider it appropriate to use tertiary sources such as encyclopedias as a sole source for any information—citing an encyclopedia as an important reference in footnotes or bibliographies may result in censure or a failing grade. Wikipedia articles should be used for background information, as a reference for correct terminology and search terms, and as a starting point for further research.
>
>       As with any community-built reference, there is a possibility for error in Wikipedia's content—please check your facts against multiple sources and read our disclaimers for more information.

Wikipedia, *Cite Page: Jet Ski*, http://en.wikipedia.org/w/index.php?title= Special:Cite&page=Jet_Ski&id=493156065 (as of Aug. 13, 2012, 18:52 GMT).[1]

---

1. Reliability may also be an issue for the Wikipedia citation itself:
> A defining feature of Wikipedia is that its entries are in a constant state of change. The impermanent nature of the information on Wikipedia has serious consequences when Wikipedia entries are cited in judicial opinions. Unless they are provided with a date- and time-specific citation,

(continued...)

¶16    Citing Wikipedia is as controversial as it is common.[2] Some courts approve it, others condemn it. *Compare United States v. Lawson*, 677 F.3d 629, 650 (4th Cir. 2012) (stating that the court is "troubled by Wikipedia's lack of reliability"), *Bing Shun Li v. Holder*, 400 Fed. App'x 854, 857–58 (5th Cir. 2010) (expressing "disapproval of the [immigration judge]'s reliance on Wikipedia and [warning] against any improper reliance on it or similarly unreliable internet sources in the future"), *Badasa v. Mukasey*, 540 F.3d 909, 910–11 (8th Cir. 2008) (noting Wikipedia's acknowledgment that, "at any given moment," an entry "could be in the middle of a large edit or it could have been recently vandalized" (citation and internal quotation marks omitted)), *and In re Marriage of Lamoure*, 132 Cal. Rptr. 3d 1, 15 (Cal. Ct. App. 2011) ("We do not consider Wikipedia a sufficiently reliable source" for defining the term "noncustodial."), *with Prude v. Clarke*, 675 F.3d 732, 734 (7th Cir. 2012) (citing Wikipedia entry, in the context of an Eighth Amendment challenge, for the proposition that an anal fissure "is no fun at all"), *United States v. Brown*, 669 F.3d 10, 18 & n.12 (1st Cir. 2012) (citing Wikipedia for its definition of "sovereign citizen movement," one of a criminal defendant's "atypical legal beliefs"), *Murdock v. Astrue*, 458 Fed. App'x 702, 705 n.3 (10th Cir. 2012) (citing Wikipedia for "some examples of block lengths from cities in this country"), *and State v. Ballard*, 2012-NMCA-043, ¶ 19 n.1, 276 P.3d 976 (N.M. Ct. App. 2012) (citing Wikipedia to define "peer-to-peer file sharing").

¶17    A recent law review article by Professor Lee F. Peoples examines in depth the issues surrounding the citation of Wikipedia in judicial opinions. *See* Lee F. Peoples,

---

1.  (...continued)

> researchers who pull up a Wikipedia entry cited in a judicial opinion will never be absolutely certain they are viewing the entry as it existed when the judge viewed it. . . . This may ultimately lead to uncertainty and instability in the law.

Lee F. Peoples, *The Citation of Wikipedia in Judicial Opinions*, 12 Yale J.L. & Tech. 1, 38–39 (2009–2010). Fortunately, each Wikipedia entry has a "Cite this page" link showing citations to that entry in various styles, including the style prescribed by the Harvard Journal of Law & Technology. That journal's citation style, which I have followed in this opinion, is more specific than ordinary Bluebook citation style.

2.  "Many citations by judges, often in footnotes, are . . . beside the main judicial point, [and] appear intended to show how hip and contemporary the judge is . . . ." Noam Cohen, *Courts Turn to Wikipedia, but Selectively*, N.Y. Times, Jan. 29, 2007, *available at* http://www.nytimes.com/2007/01/29/technology/29wikipedia.html. The lead opinion's citation to Wikipedia is obviously not of this type.

*The Citation of Wikipedia in Judicial Opinions,* 12 Yale J.L. & Tech. 1 (2009–2010).  While Wikipedia is gaining acceptance among judicial writers, Professor Peoples notes that reliance on Wikipedia has occasionally been held to be erroneous:

> [A]ppellate courts have reversed or found error in lower court decisions [for] relying on Wikipedia entries for psychological research in a child custody case, for attempting to refute expert medical testimony with a Wikipedia entry, and perhaps most egregiously for denying an asylum seeker's request based on information obtained from Wikipedia.

*Id.* at 45 (footnotes omitted) (citing *Badasa*, 540 F.3d at 909; *Campbell v. Secretary of Health & Human Servs.*, 69 Fed. Cl. 775, 781 (2006); *D.M. v. Department of Children & Family Servs.*, 979 So. 2d 1007, 1010 (Fla. Dist. Ct. App. 2008), *reh'g en banc granted* (May 14, 2008)).

¶18    Professor Peoples extracts from the case law "several bright line rules for when a Wikipedia entry should not be cited in a judicial opinion." *Id.* at 28.  For example, he suggests that "[c]ourts should not take judicial notice of Wikipedia content," because that content "is disputable and its accuracy can be reasonably questioned." *Id.*  He also states that "Wikipedia should not be cited when a more authoritative source exists for the information." *Id.* at 29.  In particular, Wikipedia is a poor source "to define technical or scientific terms." *Id.* at 46.  And he cautions that "[a] Wikipedia entry should not be relied upon as the only basis for a court's holding, reasoning, or logic," given the encyclopedia's "numerous shortcomings" discussed in his article. *Id.* at 29.[3]

---

3.  Among its shortcomings—and strengths—is Wikipedia's fluidity.  Anyone can edit a Wikipedia entry at any time, making it vulnerable to "'opportunistic editing.'" *See* Noam Cohen, *Courts Turn to Wikipedia, but Selectively*, N.Y. Times, Jan. 29, 2007, *available at* http://www.nytimes.com/2007/01/29/technology/29wikipedia.html (quoting Professor Cass Sunstein).  Thus, "'an unscrupulous lawyer (or client) could edit the Web site entry to frame the facts in a light favorable to the client's cause.'"  Peoples, 12 Yale J.L. & Tech. at 24 (quoting R. Jason Richards, *Courting Wikipedia*, Trial, Apr. 2008, at 63).

   Opportunistic editing is detectable, however.  Every article on Wikipedia has a "View history" tab with links to all previous edits, the dates of each edit, and the user name or IP address of each editor.  The revision history also allows the reader to view an article in each of its previous iterations.  By this method, we can see that the three

(continued...)

¶19 However, Professor Peoples acknowledges "some limited instances where it is appropriate for a Wikipedia citation to appear in a judicial opinion." *Id.* at 30. Some are obvious, such as where the Wikipedia entry itself is at issue or where the court must address a Wikipedia entry cited by a party. *See id.* In addition, the evolving nature of Wikipedia "makes it a good source for definitions of new slang terms, for popular culture references, and for jargon and lingo including computer and technology terms." *Id.* at 31 (citing "tweaking," "phreakers," and "screenshot").

¶20 Relevant here, Professor Peoples also states that "Wikipedia entries can be useful in some limited situations . . . for getting a sense of a term's common usage." *Id.* at 50. In particular, he recognizes the utility of Wikipedia in the interpretation of terms appearing in insurance contracts:

> The collaborative process used to create Wikipedia entries makes them potentially useful to courts in specific situations. In several cases courts attempting to interpret insurance contracts have turned to Wikipedia entries for evidence of the common usage or ordinary and plain meaning of a contract term. This method of interpretation [i.e., looking to common usage] "has long been recognized, and has been applied in the context of various types of insurance." Wikipedia has been used in this context to define the terms "recreational vehicle" and "car accident."

*Id.* at 32 (footnotes omitted) (quoting 2 Couch on Insurance § 22:38 (2005), and citing *Laasmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, No. 06-cv-00013-MSK-MJW, 2007 WL 1613255, at *4 n.5 (D. Colo. June 1, 2007); *Fergison v. Stonebridge Life Ins. Co.*, No. 271488, 2007 WL 286793, at *3 (Mich. Ct. App. Feb. 1, 2007) (per curiam)). *See also Colony Nat'l Ins. Co. v. Hing Wah Chinese Rest.*, 546 F.

---

3. (...continued)

possible meanings of the term "jet ski" discussed in the lead opinion were part of the Wikipedia article before the present dispute arose. *See* Wikipedia, *Jet Ski*, http://en.wikipedia.org/w/index.php?title=Jet_Ski&oldid=14710157 (as of June 3, 2005, 06:32 GMT).

Further, as Professor Peoples notes, "[a] database called WikiScanner allows a researcher to dig deeper into the revision of a Wikipedia article." *Id.* at 25 (citing WikiScanner, http://wikiscanner.virgil.gr/ (last visited by Peoples Dec. 16, 2009)).

Supp. 2d 202, 209 n.9 (E.D. Pa. 2008) (citing Wikipedia in a discussion of the meaning of the term "restaurant" in an insurance policy).

¶21　Of course, getting a sense of the common usage or ordinary and plain meaning of a contract term is precisely the purpose for which the lead opinion here cites Wikipedia. Our reliance on this source is therefore, in my judgment, appropriate. Moreover, here Wikipedia does not stand alone. As appellants note, the Macmillan online dictionary defines "Jet Ski" as "a very small fast boat for one or two people that you drive standing up." Macmillan Dictionary, http://www.macmillandictionary.com/dictionary/ american/Jet-Ski (last visited Aug. 13, 2012).

¶22　Finally, we need not nail down the one true meaning of "jet ski" in this case. Whatever meaning the drafters of the insurance policy may have intended, our task is to determine whether they employed "language which clearly and unmistakably communicates . . . the specific circumstances under which the expected coverage will not be provided," *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1275 (Utah 1993), or whether, on the contrary, there is "a range of possible meanings" that the term may bear in this context, *see In re E.Z.*, 2011 UT 38, ¶ 103, 266 P.3d 702 (Lee, J., concurring in part and concurring in the judgment). Whatever its shortcomings in other contexts, for this task, an open-source encyclopedia with many editors and millions of readers seems just the ticket.


_____

J. Frederic Voros Jr.,
Associate Presiding Judge